UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

MADONNA AUFFANT,

      Plaintiff,

v.                             1:05-CV-328 (NPM)

COMMISSIONER OF SOCIAL
SECURITY ADMINISTRATION,

      Defendant.

-------------------------------------------------------------------------------------------------

| APPEARANCES | OF COUNSEL |
|---|---|
| OFFICE of BRIAN R. LeCOURS<br>Attorney for Plaintiff<br>125 Wolf Road, Suite 204<br>Albany, New York 12205 | BRIAN R. LeCOURS, ESQ. |
| OFFICE of the UNITED STATES ATTORNEY<br>Attorney for the Defendant<br>100 South Clinton Street<br>Syracuse, NY 13261-7198 | WILLIAM H. PEASE, ESQ. |

NEAL P. McCURN, Senior U.S. District Court Judge

## MEMORANDUM - DECISION AND ORDER

Plaintiff Madonna Auffant ("plaintiff") brings this action pursuant to §

405(g) of the Social Security Act (the "Act"), codified at 42 U.S.C. §§ 405(g).

Plaintiff seeks review of the final decision of the defendant Commissioner ("Commissioner") of the Social Security Administration ("SSA"), who found that plaintiff's disability had ceased, and accordingly denied her continued disability insurance benefits ("DIB") under the Act.  For the reasons stated below, the Commissioner's decision will be reversed and remanded.

I.      **Facts and Procedural History**

        A.      **Facts**

        The following facts and procedural history are set forth in plaintiff's brief in support of judgment on the pleadings (Doc. No. 5), and in the administrative transcript[1] (Doc. No. 4).  The Commissioner does not contest these facts, absent any inferences or conclusions asserted by the plaintiff, and incorporates them into his brief (Doc. No. 7 at p. 3).  Plaintiff's date of birth is July 15, 1964.  She was 34 years old at the time of her first hearing, and 40 years old at the time of her latest hearing (Tr. 114).  She is a high school graduate with less than a one year college education (Tr. 481).  She worked for four years as a corrections officer and had previously done some security work (Tr. 487).  Plaintiff suffers from erythema multiforme, myalgias, arthralgias and neuropathy (Tr. 19).  She also suffers from

_____

        [1]      The court will substitute "plaintiff" for "Ms. Auffant" in the transcript materials, without brackets, throughout this MDO.

medication side effects and fatigue (Tr. 509-510).  As she testified at her most recent hearing, the erythema multiforme periodically causes blistering, which can occur on her hands, face, feet, joints, in her mouth, in her nose, and down her throat (Tr. 482).  Plaintiff testified that the blistering events can happen two to four times a year (Tr. 490), and each occasion can last two to four weeks (Tr. 492).  Plaintiff states that while in acute flair-up, she is unable to perform even the simplest of tasks.  Plaintiff testified as follows: "I can do absolutely nothing. I can't even hold a broom in my hand. I cannot cook. I can't bathe myself.  I can't wash my hair.  My husband does that for me ...there's nothing that I can do and it gets very upsetting and it gets very depressing ...."  Plaintiff also testified that she becomes disfigured from the lesions (Tr. 493).

To treat the flare-ups, plaintiff takes Prednisone for ten days (Tr. 492). Plaintiff also experiences myalgias and arthralgias in her joints and gets numbness and tingling in her hands, face and feet.  Plaintiff takes Neurontin to ease the numbness and tingling, and Nortriptyline to help her sleep (Tr. 482, 493-94). Plaintiff takes Motrin for the pain in her arms and legs (Tr. 495).  She also experiences a burning feeling on her skin (Tr. 494; 495) for which she takes Lidoderm (Tr. 494).  While the blistering comes and goes, the other symptoms occur on a daily basis (Tr. 496).

3

Plaintiff also testified that she experiences side effects from her medication. She states that she feels disconnected, and like she is not in control.  At her hearing, plaintiff stated that if she had taken her medications on hearing day, she would probably be slurring her words, and unable to think quickly (Tr. 509).  Plaintiff claims that she loses concentration.  As an example, plaintiff states that she is unable to pay attention long enough watch a two hour movie (Tr. 510).

**B.    Procedural History**

Plaintiff filed an application for social security disability insurance benefits on or about May 6, 1998 (Tr. 114).[2]  The claim was initially denied (Tr. 28-31) and upon reconsideration was denied again  (Tr. 32-35).  A hearing was requested by plaintiff (Tr. 36).  Upon completion of that hearing, the administrative law judge ("ALJ"), in a decision rendered on March 25, 1999,  found plaintiff disabled and entitled to a period of disability dating back to May 31, 1997 (Tr. 46-56).

On February 4, 2003, the Social Security Administration notified plaintiff that pursuant to a continuing periodic review, she had been found to be not disabled, and her disability benefits would cease effective that month.  However, plaintiff was advised that she would receive benefits through April 2003.  The SSA notified plaintiff that its decision was based  on the ground that her "health has

---

[2]     Transcript of the record on review, hereafter "Tr."

improved" and that she was "now able to work" (Tr. 57-58). Plaintiff requested

reconsideration of this decision (Tr. 59-60) but that request was denied on July 10,

2003 (Tr. 63-88). Plaintiff obtained legal representation and requested an

administrative hearing (Tr. 89-90) which was held on September 29, 2004.

Plaintiff testified before ALJ Thomas Zolezzi (Tr. 477-515). The ALJ issued an

unfavorable decision on October 19, 2004 (Tr. 8-20). This appeal followed.

### C.    Treating Physicians

The following is a summary of the opinions of plaintiff's treating physicians

at all times pertinent to the case at bar, and which were available to the ALJ for

consideration prior to reaching his unfavorable determination. The ALJ specifically

mentions Dr. French, Dr. Lava and Dr. Von Reusner in his written decision.

### 1.    Dr. Von Reusner

From approximately 2000 until the date of this action, plaintiff's treating

physician was Mathias Von Reusner, M.D. ("Dr. Von Reusner"). A note written by

Dr. Von Reusner dated October 16, 2001 indicates: "Follow-up patient from

Catskill. She has been fully investigated for MS, which was negative in Albany.

She has a history of erythema multiforme. She has a muscle twitching and can't

control her legs at night. She feels sometimes like she is spaced out in a dream. She

is afraid of these symptoms...." (Tr. 420). Dr. Von Reusner assessed this as

"possible neuropathy, unknown origin" and "restless leg syndrome" (Tr. 420).  A

further note dated October 16, 2001 indicates complaints of "muscle tremors,

disorientation, clumsy" (Tr. 421).  A note dated October 30, 2001 indicates "FU

Blister on hands, elbow" (Tr. 419).  On October 31, 2001, Dr. Von Reusner

recorded: "Erythema multiforme lesions on her arms and hands and face. It is again

erythema multiforme. She has it for three days now. She has all her symptoms with

fatigue, lack of concentration and numbness in her arms and legs prior to that and

she disconcerted [sic] there is a pattern to developing these symptoms. Dr. French

prescribed Prednisone...." (Tr. 418).  That same office note indicates "she looks

well," even as it goes on to record, "she has typical erythema multiforme patches

over her lips, face and hands which look like little target lesions" (Tr. 418).

Plaintiff was told to increase her Prednisone for two days (Tr. 418).

On May 23, 2002, Dr. Von Reusner noted plaintiff's  "unexplained possible

neuropathy and some weight loss" and put her on Prevacid.  That note reads, "her

skin rash has not shown up."  On July 25, 2002, plaintiff complained of feeling like

"bugs crawling all over, brain feels cold, off balance, fingers twitching" (Tr. 416).

Plaintiff saw Dr. Von Reusner on January 17, 2003, who  noted:  "Severe

heartburn. Was not relieved with Prevacid. No more neuropathy or skin rash so far.

She is still unable to work. She is not seeing any of the specialists currently" (Tr.

412).  On March 7, 2003, plaintiff again visited her treating physician, complaining of her skin burning post hysterectomy, which Dr. Von Reusner assessed as "most likely some neuropathic nerve pain post surgery" (Tr. 445). On May 29, 2003, plaintiff complained that her legs felt heavy, and complained of headaches and of feeling forgetful (Tr. 444).  Dr. Von Reusner's assessment included "myalgia, fatigues and neuropathy" (Tr. 444).

On July 25, 2003, plaintiff complained of "both legs burning and painful" and was directed to increase her Motrin to 600 mgs (Tr. 443).  On a September 9, 2003 visit, plaintiff complained that she "feels like crying," had a lack of concentration, and had a skin rash (Tr. 442).  The note appears to read "acute fatigue, pending erythema multiforme." Dr. Von Reusner prescribed Prednisone (Tr. 442).  Dr. Von Reusner's notes of December 23, 2003, indicate that plaintiff sought treatment for anxiety, and her past medical history of erythema multiforme was discussed (Tr. 438).

On July 11, 2004, in response to a request made by plaintiff's counsel on June 24, 2004, Dr. Von Reusner provided updated medical records and a form setting forth opinion evidence regarding plaintiff's residual functional capacity ("RFC") (Tr. 427-447).  Dr. Von Reusner stated that plaintiff could stand and walk a maximum of "less than two hours" in an eight hour work day.  He further opined

that she had the capacity to sit for "about four hours" per day (Tr. 429).  Plaintiff

would need to change position, for sitting and standing, every thirty minutes (Tr.

430).  He concluded that, on average, plaintiff would have to be absent from work

"about twice a month" (Tr. 431).

During a February 9, 2004 visit to Dr. Von Reusner, the doctor noted that

plaintiff had "a little eruption over her hand," referring to her erythema multiforme

(Tr. 434).  She presented with symptoms of anxiety on that visit and on a February

24 visit, following her attempt to quit smoking (Tr. 432, 434).  During a January 26,

2004 visit, she had an eruption over her hand (Tr. 436).

2.    Dr. Lava

Plaintiff also sought help from neurologist Neil S. Lava, MD ("Dr. Lava").

Dr. Lava could not explain plaintiff's complaints of a burning sensation, achiness or

fatigue (Tr. 388-389).  In a letter to Dr. Von Reusner dated January 2, 2001, Dr.

Lava recounted plaintiff's history, including complaints of numbness, tingling and

discomfort in her hands, feet, legs, face as well as her forgetfulness (Tr. 384-86).

Dr. Lava commented on her negative MRI and he noted a normal EMG (Tr.

385-387).  His sensory examination revealed "a slight decreased pinprick to the

wrists and ankles bilaterally" (Tr. 386).  He stated that he could not make a

neurological diagnosis, and also that "the sensory complaints could be related" to an

immunological problem (Tr. 386).  Plaintiff had a series of nerve evoked potential

studies done in May 2001, all of which yielded normal results (Tr. 371-374).  Nerve

conduction studies were also normal (Tr. 375-383).  On July 19, 2001, Dr. Lava

performed a lumbar puncture on plaintiff (Tr. 365).  Dr. Lava saw plaintiff again on

December 24, 2001, at which time her neurological exam was "entirely benign" (Tr.

389).

Dr. Lava saw plaintiff in May of 2003 and again on September 13, 2004 (Tr.

451).  He noted that her complaints since her May 2003 visit were similar but

worse.  Dr. Lava noted that

> [h]er hands are feeling more swollen. When she lies down
> at night to go to sleep she is awaken (sic) within a few
> hours with a swelling feeling in her hands and forearms.
> She will awaken intermittently at night, but the feeling
> does not go away. If she gets up and moves around the
> feeling is a bit better. By the morning she is very
> uncomfortable and it feels as if her skin and her entire
> body is very swollen. As the morning wears on this
> feeling goes away and she is fine until the night again.
> She, however, has some tingling in her hands and feet as
> before.

(Tr. 451).

Dr. Lava did not have an explanation for the fact that she was symptomatic.

Id.  Dr. Lava performed tests, one of which disclosed a "mildly elevated ANA"[3] and

_____

[3]        In her deposition testimony, plaintiff states this translates as  "antinuclear
antibodies." Tr. 490.  Antinuclear antibodies are substances produced by the immune system that
attack the body's own tissues. See  National Institutes of Health Medical Dictionary,

he sent her to see a rheumatologist (Tr. 459).  Dr. Lava informed plaintiff that if he

couldn't make her feel better he would send her to the University of Rochester for

another opinion (Tr. 452).

> 3.     Dr. French

John French, MD ("Dr. French") was also one of plaintiff's treating

physicians.  By report dated June 3, 1999, he noted her "rather unusual history of

recurrent skin lesions, fatigue and probable Raynaud's" and noted that serologic

testing "has been completely unremarkable with the exception of borderline

ANA's"....(Tr. 355).  In a report dated April 6, 2000, Dr. French still did not have a

diagnosis for plaintiff's condition, although he "treated her empirically" with

Prednisone (Tr. 348, 349).  By report dated June 8, 2000, Dr. French was

suspecting Sjogren's disease as plaintiff's problem (Tr. 346).  At that point, plaintiff

was complaining of stiffness in her right thigh and had occasional tingling,

bilaterally, in the upper and lower extremities (Tr. 346).  On July 11, 2000, plaintiff

complained of numbness and tingling in the jaw, right arm and right leg (Tr. 344).

On September 19, 2000, plaintiff reported to Dr. French that since she began the

Neurontin, her numbness and tingling had diminished by ninety percent (Tr. 343).

Dr. French indicated, "Skin biopsy in the past has suggested a diagnosis of bullous

---

http://www.nlm.nih.gov/medlineplus/ency/article/003535.htm (2009).

erythema multiforme. There has been a question of lupus" (Tr. 343). A note dated November 30, 2000 documented continuing paresthesias "of the upper and lower extremities" and continuing episodic skin lesions (Tr. 342). On July 5, 2001, plaintiff reported a swollen feeling in her legs and problems with balance (Tr. 331). She had had an acute exacerbation of the skin lesions, for which she was taking Prednisone (Tr. 331). A note dated December 11, 2001 indicates that plaintiff "may have a neuropathy, but the precise nature of this condition has yet to be defined" (Tr. 330). On this date, plaintiff complained of muscle discomfort and problems concentrating, fatigue, and a burning feeling of the hands and feet (Tr. 330). The examination of that date was remarkable "only for possible diffuse diminishment in intensity of DTR's" (Tr. 330).

4.  Dr. Merzig

On October 20, 2004, Dr. Lava referred plaintiff to rheumatologist Edward G. Merzig, MD, ("Dr. Merzig") regarding her complaints of joint pain and fatigue (Tr. 461-469). The objective results of the examination on that date included the following: "joint exam shows tenderness, stiffness and palpable synovitis of both sacroiliac joints, shoulder joints, wrist joints, MCP joints, PIP joints and MTP joints" (Tr. 465). At a followup visit on November 30, 2004, Dr. Merzig reported that "[t]he patient is generally not doing well." Plaintiff was scheduled for a return

11

visit in four weeks. (Tr. 466).

        D.    Non-treating Physicians

The record contains a May 30, 2003 "Request for Medical Advice" from the New York State Office of Temporary and Disability Assistance which was completed by Alan Auerbach, M.D., who examined plaintiff's file as it existed at the time and concluded, "the claimant should be capable of medium work" (Tr. 426).   Another non-examining physician, C. Levit, MD, filled out a New York State Department of Social Services Center for Disability Rights ("CDR") form on or about January 29, 2003, concluding that he "would offer RFC sedentary" (Tr. 423).   Attached to Levit's CDR is an "Explanation of Determination" that quotes Dr. Von Reusner as follows: "NOTE FROM DR. REUSNER (sic) STATES CLMT HAS NO MORE NEUROPATHY OR SKIN RASH SO FAR. SHE IS NOT SEEING ANY OF THE SPECIALISTS CURRENTLY (1/03)) (Tr. 425).   The "Explanation of Determination" failed to mention that Dr. Von Reusner's note included the words, as stated supra, "[s]he is still unable to work" (Tr. 412), nor does it indicate that plaintiff was instructed to self-treat her erythema multiforme lesions with Prednisone (see eg. Tr. 418).

Susan Kerlinsky, MD ("Dr. Kerlinsky") performed a consultative examination upon plaintiff on October 3, 2002 at the request of the SSA (Tr.

401-404).  Dr. Kerlinsky noted plaintiff's complaints as follows: "She states that she has erythema multiform which was first diagnosed at age 14 and consists of large blisters which break out on her hands and feet as well as in her mouth and throat and on her face ... She has flares two to four times per year, which last a few weeks and which is treated with a tapering does of [P]rednisone, starting at about 80 mgs. Her last flare was in 5/02, and it was not a severe episode, and lasted about two weeks. She states that when she has a flare she is unable to hold a broom or a mop in her hand or to self-groom because of the blisters ... The second problem which she describes is numbness and tingling of the right side of her face, as well as of her feet, hands and legs. Also muscle spasms of her upper arm and thigh muscles, as well as twitching of her chin, fingers, and toes as well as balance problems. She describes vertigo...." (Tr. 401).  Dr. Kerlinsky's physical examination was negative, as plaintiff's erythema multiforme was not in flare-up that day (Tr. 402).  Dr. Kerlinsky's diagnoses included erythema multiforme and "neurologic symptoms, MRI negative for multiple sclerosis" (Tr. 404).  She concluded: "There are no restrictions based upon the findings of today's evaluation, **but would refer patient to treating doctor for better assessment and documentation of extent and type of limitation during acute erythema multiforme episodes**" (Tr. 404) (emphasis added).

C.     Contentions

Plaintiff now asks this court to decide whether the Commisioner's

determination that plaintiff is no longer disabled is supported by substantial

evidence and is free of legal error.  Plaintiff argues that (1) the ALJ erred in

determining residual functional capacity and failed to follow the treating

physician's rule, and (2) the ALJ erred in assessing credibility and failed to make a

credibility finding.

II.     Discussion

A.     Standard of Review

This court does not review a final decision of the Commissioner de novo, but

instead "must determine whether the correct legal standards were applied and

whether substantial evidence supports the decision."  Butts v. Barnhart, 388 F.3d

377, 384 (2d Cir. 2004) (internal citations omitted).  See also Halloran v. Barnhart,

362 F.3d 28, 31 (2d Cir. 2004);  Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998).

"Substantial evidence" is evidence that amounts to "more than a mere

scintilla.  It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  Halloran, 362 F.3d at 31 (quoting Richardson v.

Perales, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971)).  "An ALJ must set forth the

crucial factors justifying his findings with sufficient specificity to allow a court to

14

determine whether substantial evidence supports the decision." Gravel v. Barnhart, 360 F.Supp.2d 442, 444-45 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)).   When reviewing a determination by the Commissioner, a district court, in its discretion, "shall have the power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

**B.     Cessation of Benefits Due to Medical improvement**

In a DIB appeal such as the one before the court, where disability benefits have been awarded and subsequently terminated based on a finding of medical improvement, the standard to be applied by the ALJ differs from the standard used for an initial DIB application.  In establishing this standard, the Second Circuit has opined that "[t]he view that the Secretary may simply disregard a prior finding that a particular medical condition is disabling is inconsistent with the case law in other circuits.  These cases stand for the proposition that, having once established that a particular condition is disabling, a claimant is entitled to a presumption that as long as there is no change in the condition itself, or in the governing statutes or regulations, neither will the statutory classification of disability be changed." DeLeon v. Secretary of Health and Human Services, 734 F.2d 930, 937 (2d Cir.

1984) (internal citations omitted).  "Because we agree that benefits may not be terminated 'simply on the whim of a changed ALJ,' ... we hold that the Secretary must apply the medical improvement standard in deciding whether to terminate benefits to an individual previously found to be disabled." Id.

This court has recently set forth a thorough analysis of the medical improvement standard.  "[W]here a finding of disability has resulted in the granting of benefits under the Act, the Commissioner is statutorily charged with the duty to engage in a continuing, periodic review of the claimant's condition. 42 U.S.C. § 421(i); see also 42 U.S.C. § 425(a).  If, based upon that review, the Commissioner determines that the disabling condition has subsided, does not exist, or is not disabling, a termination of benefits may be ordered. 42 U.S.C. § 423(f)." Wright v. Commissioner of Social Security, 2008 WL 4287387at *5 (N.D.N.Y. 2008). "Generally speaking, termination of benefits is appropriate when, inter alia, there has been medical improvement related to the claimant's ability to work. 42 U.S.C. § 423(f); 20 C.F.R. §§ 404.1594 , 416.994." Id.  The Wright court set out the criteria as follows:

> In order to support the termination of benefits, the Commissioner must meet a burden of showing, by substantial evidence, that a medical improvement has taken place in a claimant's ability to perform work activity. 42 U.S.C. § 423(f)(1)(A); 20 C.F.R. §§ 404.1594, 416.994.  A medical improvement is defined as

16

"any decrease in the medical severity" of an impairment. 20 C.F.R. §§ 404.1594(b)(1), 416.994(b)(1). Any decrease must be based upon changes in the symptoms, signs, and/or laboratory findings associated with the impairment." Id.   To find medical improvement, the Commissioner must compare the prior and current medical evidence to determine whether there have been any changes in signs, symptoms, and laboratory findings associated with the claimant's impairment. 20 C.F.R. §§ 404.1594(b)(7), 404.1594(c) (1).

If there has been a medical improvement, the Commissioner must then determine whether the improvement is related to the claimant's ability to work. 20 C.F.R. §§ 404.1594(a), 416.994(b). A medical improvement will be related to the claimant's ability to work where it results in a decrease in the severity of the impairment present at the time of the most recent favorable medical decision and an increase in the claimant's functional capacity to perform basic work activities. 20 C.F.R. §§ 404.1594(b)(3), 416.994(b). Basic work activities include abilities and attributes necessary to do most jobs, such as walking, standing, pushing, pulling, reaching, carrying, hearing, speaking, remembering, and using judgment. 20 C.F.R. § 404.1594(b)(4). Even where a medical improvement related to claimant's ability to work has occurred, in most cases the Commissioner must show that the claimant is able to engage in substantial gainful activity before he will be found no longer disabled. 20 C.F.R. § 404.1594(a). In examining claimant's ability to work, all impairments existing at the time of analysis must be considered. 20 C.F.R. § 404.1594(b)(5).

Wright, 2008 WL 4287387 at * 8 (West 2009).

In the case at bar, plaintiff argues and the court concurs that the ALJ failed to

use the correct standard in making his determination that plaintiff was not disabled. Based on the criteria set forth supra, the court finds no comprehensive comparison of the plaintiff's prior and current medical evidence to determine whether there was any change in signs, symptoms, and laboratory findings associated with plaintiff's impairment.  The ALJ recited the plaintiff's medical history from the time she was deemed disabled until the time the SSA deemed plaintiff to have experienced medical improvement.  In addition to his failure to perform an in-depth comparison of plaintiff's original and current complaints and physical evidence, the ALJ focused on the unrelated issue of anxiety surrounding plaintiff's recent efforts to quit smoking, found improvement on that issue, and made his determination of medical improvement in the very next paragraph (Tr. 16).  The court finds no connection between the plaintiff's disability as set forth in the transcript and the finding of an improvement in the unrelated matter of plaintiff's anxiety surrounding smoking cessation.

The court notes that the ALJ set forth the appropriate law for medical improvement in his decision (Tr. 13), yet after conducting a careful review of that unfavorable decision, the court finds that the ALJ did not adhere to the criteria set forth in that law to make his determination.  To avoid any possibility that plaintiff's

disability benefits were discontinued "simply on the whim of a changed ALJ,"[4] the court remands this case back to the Commisioner for further consideration consistent with this opinion.  Accordingly, the court finds that the ALJ's determination that plaintiff was no longer disabled  was based on legal error, and was not supported by substantial evidence.  While this factor alone suffices to send the case back to an ALJ for further consideration, in the interest of judicial economy, the court will consider the other points raised by plaintiff.

### C.    The Treating Physician's Rule

Plaintiff's next challenge to the ALJ's decision is that the ALJ did not give adequate consideration to the medical evidence provided by her treating physician, specifically Dr. Von Reusner.   According to the "treating physician's rule,"[5] the ALJ must give controlling weight to the treating physician's opinion when the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 404.1527(d)(2); see also Green-Younger v. Barnhart, 2003 WL 21545097 at *6 (2d Cir.2003); Shaw v. Chater, 221 F.3d 126, 134 (2d

---

[4]        See DeLeon v. Secretary of Health and Human Services, 734 F.2d 930, 937 (2d Cir. 1984), supra..

[5]        "The 'treating physician's rule' is a series of regulations set forth by the Commissioner in 20 C.F.R. SS 404.1527 detailing the weight to be accorded a treating physician's opinion." de Roman v. Barnhart, 2003 WL 21511160, at *9 (S.D.N.Y. 2003).

19

Cir.2000).

"Even if a treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ may nonetheless give it 'extra weight' under certain circumstances." Comstock v. Astrue, 2009 WL 116975 at * 4 (N.D.N.Y. 2009).

> Under C.F.R. § 404.1527(d)(1)-(6), the ALJ should consider the following factors when determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight: (1) length of the treatment relationship and the frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of the treating physician, and (6) other factors that are brought to the attention of the court.

Comstock, 2009 WL 116975 at *4.

In the instant case, the ALJ did not give controlling weight to the opinion of the treating physician Dr. Von Reusner.   The court perceives no indication that the ALJ, prior to making his determination, addressed the criteria set forth above to determine how much weight to give Dr. Von Reusner's evaluation of the plaintiff. To be sure, the Commissioner's brief (Doc. No. 7) sets forth Dr. Von Reusner's on-going treatment and opinions in great detail, in order to convince this court that the ALJ did, in fact, give consideration to Dr. Von Reusner's views.  However, this court is tasked only with deciding whether the correct legal standards were applied and whether substantial evidence supports the decision by the ALJ, not with

deciding whether the plaintiff does or does not remain disabled.

The ALJ gave "great weight" to non-treating physician Dr. Kerlinsky's opinion, whose evaluation found no restrictions on plaintiff's ability to work, because the ALJ subjectively found that Dr. Kerlinsky's opinion was "supported by the objective findings outlined in this examination" (Tr. 16).  However, the ALJ overlooked Dr. Kerlinsky's deference to the opinion of plaintiff's treating physician, set forth supra [6] (Tr. 404).  The ALJ determined that "[Dr. Von Reusner's] opinion contrasts sharply with the other evidence of record, which renders it less persuasive" (Tr. 18).  Upon remand, the court directs the Commisioner to apply the factors set forth supra when "determining the proper weight to afford the treating physician's opinion if it is not entitled to controlling weight." Comstock, 2009 WL 116975 at *4.

## D.    Residual Functional Capacity Assessment

Plaintiff asserts that the ALJ's RFC assessment that plaintiff "retains[7] the residual functional capacity to perform sedentary work" (Tr. 19) is not supported by substantial evidence in the record.  RFC is defined in the regulations as "an

---

[6]      See emphasized quote at page 13 of this ruling.

[7]      The court notes that plaintiff was found to be disabled in March of 1997, and questions, pursuant to the controlling statutes, how the ALJ could find that plaintiff "retains" the RFC for sedentary work on October 19, 2004.

21

assessment of an individual's ability to do sustained work-related physical and

mental activities in a work setting on a regular and continued basis," which means

"8 hours a day, for 5 days a week, or an equivalent work schedule."  RFC is the

most an individual can do despite his or her limitations or restrictions.  Social

Security Ruling 96-8p (West 2009).

> The RFC assessment must be based on ***all*** of the relevant
> evidence in the case record, such as:
>
> [m]edical history, [m]edical signs and laboratory findings,
> [t]he effects of treatment, including limitations or
> restrictions imposed by the mechanics of treatment (e.g.,
> frequency of treatment, duration, disruption to routine,
> side effects of medication), [r]eports of daily activities,
> [l]ay evidence, [r]ecorded observations, [m]edical source
> statements, [e]ffects of symptoms, including pain, that are
> reasonably attributed to a medically determinable
> impairment, [e]vidence from attempts to work, [n]eed for
> a structured living environment, and [w]ork evaluations,
> if available.

Id. (emphasis in original).

Plaintiff argues, and the court concurs, that in a cessation of benefits case, the

ALJ should determine what symptoms are now absent that were present when the

disability claim was established.  This court has found, supra, that the ALJ

discounted Dr. Von Reusner's opinions on this issue, including his opinion that

plaintiff "is still unable to work,"  (Tr. 412) without an assessment of what weight

was to be afforded Dr. Von Reusner's evaluation of the plaintiff.  Further, the court

22

finds that in reaching his determination that plaintiff was not disabled, the ALJ

failed to consider, inter alia, the effects of plaintiff's medical treatment, or her

complaints of pain and discomfort that she has on a daily basis, as opposed to the

ALJ's consideration of simply the related flare-ups of the erythema multiforme

lesions that occurred two to four times per year.  The court instructs the

Commisioner to reevaluate plaintiff's RFC based on all the relevant evidence set

forth in Social Security Ruling 96-8p.

### E.    Credibility Assessment

An ALJ is required to evaluate a claimant's credibility concerning pain

according to the factors set forth in 20 C.F.R. § 404.1529, which states in pertinent

part that:

> [i]n determining whether you are disabled, we consider all
> your symptoms, including pain, and the extent to which
> your symptoms can reasonably be accepted as consistent
> with the objective medical evidence and other evidence ...
> These include statements or reports from you, your
> treating or examining physician or psychologist, and
> others about your medical history, diagnosis, prescribed
> treatment, daily activities, efforts to work, and any other
> evidence showing how your impairment(s) and any
> related symptoms affect your ability to work. We will
> consider all of your statements about your symptoms,
> such as pain, and any description you, your physician,
> your psychologist, or other persons may provide about
> how the symptoms affect your activities of daily living
> and your ability to work.

20 C.F.R. § 404.1529 (West 2007).

Social Security Ruling ("SSR") 96-7p governs how ALJs may evaluate the credibility of an individual's statements.  Stated here in pertinent part:

> The purpose of this Ruling is to clarify when the evaluation of symptoms, including pain, under 20 CFR 404.1529 and 416.929 requires a finding about the credibility of an individual's statements about pain or other symptom(s) and its functional effects; to explain the factors to be considered in assessing the credibility of the individual's statements about symptoms; and to state the importance of explaining the reasons for the finding about the credibility of the individual's statements in the disability determination or decision. In particular, this Ruling emphasizes that:
>
> 1. No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms.
>
> 2. When the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms has been established, the intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities. This requires the adjudicator to make a finding about the credibility of the individual's statements about the symptom(s) and its functional effects.
>
> 3. Because symptoms, such as pain, sometimes suggest a

24

greater severity of impairment than can be shown by objective medical evidence alone, the adjudicator must carefully consider the individual's statements about symptoms with the rest of the relevant evidence in the case record in reaching a conclusion about the credibility of the individual's statements if a disability determination or decision that is fully favorable to the individual cannot be made solely on the basis of objective medical evidence.

4. In determining the credibility of the individual's statements, the adjudicator must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record. An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.

5. It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. **The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight....**

25

SSR 96-7 (West 2009) (emphasis added).

In his unfavorable decision, the ALJ does not sufficiently address plaintiff's credibility, despite the requirement that he must do so. In considering the ALJ's opinion that "[d]espite allegations of disabling symptoms and limitations, the Administrative Law Judge must note that her examinations have been essentially unremarkable," (Tr. 18) and in reviewing the ALJ's decision as well as the medical record as a whole, this court notes that plaintiff's examinations prior to the initial finding of her disability were similarly unremarkable. Plaintiff's treating physicians have been successful in ruling certain named illnesses out, but not successful in attaching a name to or a basis for her continuing maladies. The ALJ who initially found plaintiff disabled also found that plaintiff was a credible witness, and explicitly stated that "[t]he claimant credibly testified concerning her symptoms and limitations as a result of this condition which indicated an inability to engage in any sustained activities" (Tr. 51). In the case at bar, ALJ Zolezzi, in deciding that plaintiff was not disabled, was also required to state his opinion of plaintiff's credibility. While the court discerns by innuendo in the ALJ's decision that he considered plaintiff was less than credible (Tr. 19)[8], the ALJ failed to explicitly

---

[8] The ALJ opined that "[a]lthough the Administrative Law Judge does not doubt that the claimant has some discomfort, he does not find it is of the intensity, duration or frequency as to prevent the performance of work-related functions." The ALJ's opinion is in direct contradiction to the plaintiff's sworn testimony, but he makes no mention of his

discuss plaintiff's credibility as required.  The closest the ALJ came to discussing

plaintiff's credibility was his statement regarding plaintiff's complaints of painful

and burning legs, and heaviness in her legs. The ALJ opined that "[a]lthough the

diagnostic test and examinations have failed to find reasons for her complaints, the

Administrative Law Judge has given the claimant the benefit of the doubt and finds

it reasonable to reduce the claimant's residual functional capacity to sedentary."

The ALJ gives no explanation why he gives plaintiff only the benefit of the doubt,

and not the total credibility she was afforded by the ALJ who found her disabled.

Here, plaintiff has unequivocally been found by her treating physicians to be

afflicted by erythema multiforme.  Her treating physicians have determined that this

illness is capable of causing the pain and other discomforts of which plaintiff

complains.  The court notes that plaintiff has undergone a battery of tests in the

years since she was declared disabled, presumably in the hope of finding the

underlying cause for her discomfort to regain her health.   As set forth supra,

> [i]n determining the credibility of the individual's statements,
> the adjudicator must consider the entire case record, including
> the objective medical evidence, the individual's own statements
> about symptoms, statements and other information provided by
> treating or examining physicians or psychologists and other
> persons about the symptoms and how they affect the individual,
> and any other relevant evidence in the case record ... An

---

determination of credibility.

27

> individual's statements about the intensity and persistence of
> pain or other symptoms or about the effect the symptoms have
> on his or her ability to work may not be disregarded solely
> because they are not substantiated by objective medical evidence
> ... The determination or decision must contain specific reasons
> for the finding on credibility, supported by the evidence in the
> case record, and must be sufficiently specific to make clear to
> the individual and to any subsequent reviewers the weight the
> adjudicator gave to the individual's statements and the reasons
> for that weight..."

SSR 96-7 (West 2009).

The court holds that this standard was not met in the instant case. Accordingly, at plaintiff's next hearing on this matter, the Commisioner is directed to apply the criteria set forth in SSR 96-7 in determining plaintiff's credibility, in accordance with this ruling.

In sum, the ALJ reached the conclusion that "[t]he claimant continues to have a severe impairment due to erythema multiformi, myalgias and arthralgias and neuropathy but does not have impairments that meet or equal the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4." (Tr. 19). The court finds that the ALJ does not treat this case as a cessation of benefits case. The ALJ fails to factor in the presumption "that as long as there is no change in the condition itself, or in the governing statutes or regulations, neither will the statutory

classification of disability be changed,"[9] of which the plaintiff is entitled.

The court notes that the Commissioner's brief is thorough and well-written and adheres to the law set forth above.  As persuasive as the brief may be, however, it cannot be substituted for the ALJ's decision, which is woefully inadequate in its application of the law.  In other words, the pleadings now before this court cannot negate the fact that the ALJ did not follow SSA regulations in his determination that plaintiff is no longer disabled.

### F.      Hearing Requested Before a New ALJ

Plaintiff avers that because the ALJ cessation decision is the product of erroneous standards and is not supported by substantial evidence, it must be reversed and the matter remanded for a new hearing before a different ALJ. "[W]hile the courts have long recognized a claimant's right to a hearing before an unbiased ALJ ..., the courts have also recognized that selecting a new ALJ on remand is ordinarily a decision for the Commissioner to make.  Where the record clearly demonstrates the ALJ's bias or partiality toward the claimant, the courts have not hesitated to direct the Commissioner to transfer the remand hearing to a different ALJ. However, in the absence of such proof, the reviewing court can only recommend that the Commissioner transfer the remand hearing to a different ALJ."

---

[9]      See DeLeon, 734 F.2d at 937.

Joe v. Apfel, 1998 WL 683771 at *5-6.  If plaintiff is again instructed to appeal

before ALJ Zolezzi, and feels that she cannot get a fair hearing, the court directs

plaintiff to 20 C.F.R. § 404.940, which sets forth the proper procedure a claimant

must follow for requesting disqualification of an administrative law judge.

Otherwise, the court leaves this matter to the Commissioner.

## III.    Conclusion

For the reasons set forth supra, the Commissioner's decision is hereby

REVERSED and REMANDED for further consideration consistent with this

opinion.  The Commissioner's motion for judgment on the pleadings is DENIED.

The Clerk is instructed to close this case.

**SO ORDERED.**

March 23, 2009

_____
Neal P. McCurn
Senior  U.S. District Judge

30